56 CCPA

### Application of Ulf C. H. JACOBSON.
### Patent Appeal No. 8100.

United States Court of Customs
and Patent Appeals.
March 6, 1969.

James E. Bryan, Washington, D. C.,
for appellant.

Joseph Schimmel, Washington, D. C.,
(Lutrelle F. Parker, Arlington, Va., of
counsel) for the Commissioner of Patents.

Before WORLEY, Chief Judge, and
RICH, ALMOND and BALDWIN,
Judges.

RICH, Judge.

This appeal is from the decision of the
Patent Office Board of Appeals affirming the rejection of all claims in application serial No. 200,593, filed April 30,
1962, entitled "Processing of Polymerizates," a continuation-in-part of serial
No. 690,259, filed October 15, 1957.

### THE INVENTION

The "processing" with which the application is concerned is a method of
"dry-blending" thermoplastic materials,
to be used for molding or extrusion, with
the usual plasticizers, stabilizers, color-

ing, fillers, lubricants, and the like. Although the plasticizers and some of the other materials may be liquids, they are added at such a rate and under such conditions that the mixture remains substantially dry in appearance. It is explained that certain prior art processes produced a hot gelled mass which, after cooling, had to be disintegrated or granulated to get a material suitable for use in molding or extrusion and it is stated as an object to avoid such gelling with the necessity of subsequent granulation. It is further explained that some thermoplastic materials, particularly "emulsion polymerizates," polyvinyl chloride for example, are fine powders unsuitable for use in extruders as well as difficult to blend with plasticizer, etc., and that a granular product must be produced therefrom with which to feed the extruder. It is desired to get such a product without producing an aggregate which has to be ground up or granulated and appellant does this in a blender.

A brief description of appellant's Example I will serve to illustrate. A blender consisting of a container with an agitator blade in its bottom, similar in construction to the common kitchen "Waring Blendor," is used. This industrial version, however, has a capacity of 100 liters (about 26.5 gallons) and is driven by a 20 horsepower motor. Polyvinyl chloride emulsion polymerizate in the amount of 25 kg with minor amounts of other dry ingredients are charged into it and the rotor started at 1400 rpm while 7.5 kg of liquid plasticizer (dioctyl phthalate) is added in a continuous stream during a 5-minute period. Rotor speed is then reduced to 700 rpm and, after 2 minutes, 5 kg additional plasticizer is added during 5 more minutes. After 2 minutes more, the product is discharged "as a dry, free-flowing granular material which could be processed in an extrude[r]" to form electrical cable insulation. It is said that by this technique up to 100% by weight of plasticizer and other liquids can be added without getting a wet or sticky product.

Heat is an essential part of this processing. According to the disclosure, the necessary heat, which makes the polymer receptive to plasticizer and also causes the powder particles to agglomerate to a controlled extent to form larger granules, can be produced in the blender from the friction between the particles and between the particles and the rotor. However, the specification does not limit the source of heat to the energy produced by the rotor and explains that two other sources may be used additionally, even preferably. One is the use of a heating jacket on the blender whereby the "time required for heating the charge may be reduced" and the other is that "the plasticizer and other liquid constituents may be preheated to a temperature of about 100°C, for example." In Example I there is no mention of outside sources of heat so it is assumed the necessary heat is produced by friction. In Example IV, on the other hand, the blender has a jacket heated to 130°C and the plasticizer is heated to 130°C before addition. The rotor in that example is run at 700 rpm.

It is important to the process of the invention not to heat too much. The desired range is disclosed as about 60 to 170°C, which is "below the gelling temperature of the mixture." The specification explains:

> Since the material does not gel in the blender, no disintegration or granulation of the product is necessary as it is discharged in granular form.

## THE CLAIMS

There are two independent claims from which all others depend. Claim 10 is the more specific and reads (our emphasis):

10. A process for forming free-flowing granules from thermoplastic powder which comprises maintaining the powder in a confined zone as a rapidly moving suspension and at an elevated temperature *below the gelling temperature of the thermoplastic*, resulting from the heat generated at least in part by frictional and shearing forces between the powder particles

*and adding a liquid plasticizer to the suspension* whereby the particles are fused to form granules *containing plasticizer*.

Claim 1, the other independent claim, is claim 10 with the italicized words omitted. The dependent claims, 2–9 and 11–13, will be discussed later.

## THE REJECTION

The examiner rejected all claims, 1–13, "under 35 USC 102 as fully met by" or "met by" (a less emphatic legal equivalent) the following references:

Sandler   2,477,009   July 26, 1949
Samler   2,718,471   Sept. 20, 1955

In affirming, the board said:

We have considered appellant's several arguments but will sustain the rejection of all the claims on each of the references. While the claims appear directly readable upon the references, except for dependent claim 13 specifying partial vacuum, they are, in any event, clearly unpatentable under section 35 U.S.C. 103. *In re* Pye et al., 148 USPQ 426 [53 CCPA 877, 355 F. 2d 641 (1966)].

Before us, the Solicitor for the Patent Office contends that the issues presented by the appeal encompass both anticipation under section 102 and obviousness under section 103, in view of the board's express reference to that section.

Appellant, on the contrary, says "the only rejection of the claims for review by this Honorable Court is that as fully met by the Samler and Sandler references under 35 U.S.C. 102." It seems to be his position that we are precluded from considering anything else—specifically, whether any claim is unpatentable for obviousness under section 103—because "the observation by the Board that the claims were unpatentable under Section 103 did not constitute a new rejection by the Board under Section 103 since there was no compliance with Rule 196 (b)." The solicitor says the board's above-quoted statement does comply with that rule.

*Is a Section 103 Rejection Before Us?*

Preliminarily, it seems desirable to resolve this question since the protagonists are taking diametrically opposed positions, it involves an important procedural matter of frequent occurrence, and the propriety of the rejection of certain claims depends on it.

The board cited *In re Pye* in the above-quoted passage. The most relevant passage in *Pye* reads as follows:

The record reveals some difficulty on the part of the Patent Office in agreeing on a statutory basis for the rejection. * * *

The difficulty in formulating a ground of rejection seems to have arisen from the failure to ascertain whether Touey [the reference] does in fact disclose appellants' claimed composition, so to be on the safe side, language appropriate to both 35 U.S.C. 102 and 103 was employed. In close situations claims may be rejected on section 102 and, in the alternative, section 103. But such an alternative rejection does not eliminate the need for careful scrutiny of the references to determine precisely what is disclosed to the end that the applicant may be notified with the particularity required by 35 U.S.C. 132. Appellant does not seem to have been prejudiced by the confusion here, and has argued in this appeal the issues of novelty and obviousness in view of both Touey and Fikentscher. We will consider both issues.

Appellant here, on the other hand, relies on In re Hughes, 345 F.2d 184, 52 CCPA 1355 (1965), a case in which we found that neither the examiner nor the board had specified any statutory basis for the rejection. We deduced, however, from the language of the Examiner's Answer that his rejection was based on section 102. The court divided as to what was the statutory basis of the board's affirmance, the majority saying:

Here, however, the board's opinion did not provide adequate notice that a

new statutory ground of rejection was being relied on. For all that appellant knew, from the vague language used by the board, the only rejection being passed upon was the one made by the examiner under section 102. Thus, if we were to consider, on this appeal, issues which arise under section 103, we would be doing so without affording appellant an opportunity to be heard in the administrative tribunals of the Patent Office.

The situation here is not that which the majority saw in *Hughes*. The board made it perfectly clear that, insofar as it might be necessary, i. e., to the extent that the references would not support the examiner's section 102 rejection, it was relying on section 103. Before making the statement above quoted, the board had recited that the examiner's rejections were, as to each reference, based on section 102. Appellant was very much aware of the board's partial shift in *the statutory basis* of the rejection, still based on the same references, as shown by his Request for Reconsideration, in which he said:

In the second complete paragraph on page 3 of the Board's Decision, the Board has gratuitously observed that the claims:

"are, in any event, clearly unpatentable under section 35 U.S.C. 103".

If this is, as it appears to be, a rejection under Rule 196(b), then it is requested that the Board *specifically designate it* as such or this gratuitous observation should be withdrawn. The rejection which has been affirmed is on the ground of *fully met* and that rejection obviously is not going to be sustained upon further appeal to the Court of Customs and Patent Appeals. Neither appellant nor that Court should have to speculate as to the grounds of the rejection.

We are not speculating, nor do we understand why appellant should be. This case is not like the *Hughes* case, nor governed thereby.

From the above quotation and other arguments, it appears to us that it is appellant's theory that unless the board, as it more often does than not, says "This is a new rejection under Rule 196(b)," any new rejection it may make, in any other form of statement, can be ignored. To illustrate, the solicitor argues that there are four rejections before us: anticipation and obviousness in view of Samler, and anticipation and obviousness in view of Sandler. Appellant, however, insists that "the only rejection of the claims for review by this Honorable Court is that as fully met by the Samler and Sandler references under 35 U.S.C. 102." This theory is based on the alleged failure of the board to comply with Rule 196(b). It is not quite clear to us what is the basis of this allegation. Appellant has quoted, with emphasis, that part of the rule on which he relies, as follows:

Should the Board of Appeals have knowledge of any grounds not involved in the appeal for rejecting any appealed claim, it may include in its decision a statement to that effect *with its reasons for so holding,* which statement shall constitute a rejection of the claims.

He then states that "the observation of the Board concerning the alleged unpatentability of the claims under Section 103 did not comply with Rule 196(b)," which appears to imply it was because the board did not state "its reasons for so holding." At the same time, appellant seems to argue that the non-compliance resided in a failure to designate its section 103 rejection as "a rejection under Rule 196(b)."

As to the first point, we think the board's *reasons* for holding unpatentability under section 103 are perfectly clear, namely, that whatever claim limitation could not be found expressly described in a single reference would nevertheless be obvious in view of the references. As to the second point, we find no express provision in statute, rule, or manual that requires the board to *designate* a new ground of rejection as

such or as made "pursuant to Rule 196 (b)." The statutory requirement, as applicable to the board as to examiners, is found in 35 U.S.C. § 132, In re Hughes, supra, In re Jepson, 357 F.2d 406, 53 CCPA 1023 (1966) and it requires that an applicant be notified of the reasons for a rejection so that he may be able to judge the propriety of continuing prosecution.

■■ It seems to us that a rule of reason must be applied to the application of 35 U.S.C. § 132 and Rule 196(b) by both sides. It is certainly desirable that when the board makes a *new* rejection, or an old rejection on a *new ground or statutory basis*, it should so inform the applicant. However, there is no magic in any particular form of words. When, as here, there is a shift in the statutory basis of a rejection, from section 102 to 103, but exactly the same references are relied on for the same disclosures and the section of the statute is expressly identified, the board's meaning and the newness of the rejection being apparent from the opinion as a whole, we do not consider that appellant has been prejudiced or can ignore it on the ground that the board did not designate it as "new" or "under Rule 196(b)."

Appellant insists that "no rejection as unpatentable over Samler [or Sandler] under Section 103 was ever presented to or considered by *the Board of Appeals* * * *." (Emphasis ours.) While we have to agree that the examiner did not *present* such a rejection, it is anomalous to say that having *made* such a rejection, the board did not *consider* it. Appellant cannot pretend to have been trapped or surprised. The newness of the rejection fully impressed itself on his attorney's consciousness as demonstrated by the Request for Reconsideration in which he said, "If this is, as it appears to be, a rejection under Rule 196(b), then it is requested that the Board *specifically designate it* as such * * *." He also asked the board to "make it clear as to just what section of the Statute is relied upon." We think the board did just that; it specified sections 102 and 103,

alternatively. Yet appellant, neither in his Request for Reconsideration nor in this court, has had a word to say in response to any rejection based on section 103, electing to stand on technical arguments to the effect that no such rejection exists.

■ Our conclusion is that, under the circumstances of this case, there is a section 103 rejection before us, which we shall consider in due course. But first we shall consider the section 102 rejection, made by the examiner, and affirmed by the board as to all claims except claim 13.

OPINION

■ Both references, Samler and Sandler, are directed to the same purpose as appellant's invention, the blending of powdered plastics with liquid plasticizers, fillers, stabilizers, pigments, etc., to prepare them for molding or extrusion. Both refer to vinyl polymers. Both are "dry" processes. Both produce a free-flowing, granular product. Both recognize the necessity of heating the materials to the right degree during processing and both describe two of the three ways of heating which appellant describes: (1) by heating some of the ingredients before addition and (2) by heating the mixing vessel in one way or another. The third source of heat, which appellant defines in his claims as "generated at least in part by frictional and shearing forces between the powder particles," is at the center of the dispute here. Appellant gets the kinetic energy to do this from the rotating blade in his mixer which, in claim language, has the effect of "maintaining the powder in a confined zone as a rapidly moving suspension * * *." Doing this to the particles, he recites in his claims, generates heat by reason of "frictional and shearing forces between the powder particles." What he means by "shearing" forces is not made clear since the word "shearing" appears nowhere in his specification, only in the claims. One of appellant's arguments is that the claims require *both* frictional *and* shearing forc-

es, but what the difference is and how it is obtained remains unexplained unless explanation is to be found in the fact that appellant's mixer has a high-speed rotating impeller and the references do not. But if an impeller striking particles produces shearing forces it is not seen why particles striking each other or other objects will not do the same. We cannot, under these circumstances, give any weight to the reference to both friction and shearing forces.

Referring more specifically to the references, Samler shows an apparatus in his patent, which is entitled "Blending Method and Apparatus," consisting of a conical hopper into which a quantity of powdered or granular thermoplastic is placed. At the bottom is a screw feeder which moves material from the hopper into a curved pipe which carries material from the bottom of the hopper around an external loop and back into the top of the hopper where it reenters, striking a baffle and falling. Propulsion of the plastic particles is produced by means of an inert gas blown into the pipe at the end of the screw feeder. A short distance beyond the gas inlet, the liquid materials are injected into the particles by a jet fed from a pump. Speaking of the materials moving through the curved pipe, the patent states:

> The particles suspended in the gas are caused to move at high velocities, preferably from 1500 to 4000 feet per minute. The bend in the tube 23 produces extreme turbulence which causes any formed agglomerates to break up and further disperse.

Appellant and the Patent Office both rely on this passage to further their positions. The Patent Office says it discloses the claimed step of "maintaining the powder in a confined zone as a rapidly moving suspension" and that the high speed and turbulence will produce "frictional and shearing forces between the powder particles" with resulting generation of heat. We agree. Appellant argues that the passage shows that Samler does not get granules, which is the object of his invention, because of the statement that any agglomerates will be broken up. We think it is tolerably clear, however, that breaking up agglomerates is a relative matter and that while big agglomerates or lumps may be broken up, little ones, properly denoted as "granules," can and do remain in Samler's process as an end product. After a few passes through his machine, Samler necessarily stops blowing the particles through the curved tube and eventually dumps the hopper through a discharge spout at the bottom. In his hopper are stirring or circulating devices which lift the material up and allow it to fall through space in which there is gas turbulence. No doubt his particles, coated with plasticizer and subjected to heating, are going to agglomerate to some extent in the hopper (else why would he speak of breaking up agglomerates?) before they reach the discharge. He describes his discharged product as a "particle mass in free-flowing condition." We therefore have to disagree with appellant that he does not get a granular product. If appellant gets one by his *claimed* process, so will Samler because appellant's *claimed* steps are present in Samler. Forming granules from powder is the result of limited agglomeration. We therefore find independent claims 1 and 10 anticipated by Samler.

We need not consider Sandler in detail in view of the above holding and will mention only the principal difference from Samler. Sandler mixes the thermoplastic, plasticizer, etc., in a double conical tumbler rotated at 20–25 rpm, producing "rubbing contact over a substantial period of time between the particles of the mass moving relative to each other in their free-flowing state." He may blow hot air into the tumbler for heat and preheat the plasticizer which is intermittently sprayed into the powder, at such a rate as to maintain a "substantially dry, free-flowing particle condition." We agree with the board that Sandler also anticipates the independent claims, which justifies the section 102 rejection thereon. The solicitor considered Samler the better reference and we

likewise think it is on the ground that Samler probably generates more heat from friction due to the higher speed of the particles than Sandler would from his slower tumbling.

The remaining claims are all dependent and add limitations as to maximum temperature, temperature range, to use of filler, pigment, and specific vinyl thermoplastics, external heat, or partial vacuum. The board found them all to be anticipated except for claim 13, the one specifying that "a partial vacuum is maintained in the confined zone." It is only as to that claim that the board seems clearly to have based its affirmance of the rejection on section 103.

Considering now all the dependent claims with the exception of 13, appellant does not contend they are allowable for any different reasons than those advanced as to independent claims 1 and 10 with the exception of claims 7, 9, and 12 which he says are not anticipated for special reasons. These reasons are that claims 7 and 12 specify that "the thermoplastic is a vinyl emulsion polymerizate" and claim 9 specifies that "the confined zone is heated in part by external heat." Disposing of claim 9 first, the "confined zone" in Samler includes, in our judgment, both his hopper and his curved pipe through which the contents of the hopper are continuously circulated from the bottom of the hopper to the top of it. The hopper has a heating jacket and is heated in part by external heat. Even if the confined zone is construed to be only the curved pipe, it gets heat from two "external" sources, the heating jackets on the hopper and a heater for the inert gas which is blown into it. We therefore find this limitation disclosed in Samler.

Claims 7 and 12 present a somewhat different problem. Claims 1 and 10,

from which they depend, respectively, recite "A process for forming free-flowing granules from thermoplastic powder * * *." The dependent claims say the thermoplastic is "a vinyl emulsion polymerizate." Appellant's specification says this is a type of plastic which is more difficult to handle by known blending methods and one for which his process is especially useful.[1] Appellant appears to be correct in contending that neither reference discloses vinyl *emulsion* polymerizates, even though polyvinyl thermoplastics are disclosed. For this reason, he says, claims limited thereto cannot be anticipated, i. e., rejected on section 102. The Patent Office argues that they are anticipated because Samler discloses his process as of value for treating heat-sensitive materials generally and as "applicable to * * * any thermoplastic material." Assuming without deciding that the limitations of claims 7 and 12 are really process limitations (no question having been raised on this ground), we do not think that the general disclosure of Samler can be considered anticipatory of a specific limitation not disclosed merely because the general will *include* the specific. We hold, therefore, that the section 102 rejection of claims 7 and 12 cannot be sustained, relegating us to the section 103 rejection.

We affirm the board in refusing claims 7, 12, and 13 as directed to obvious subject matter in view of the disclosures of Samler and Sandler. Clearly it would be obvious to use the blending process of either reference with any of appellant's thermoplastics, which are very closely related to those named in the references. As to using the partial vacuum of claim 13, which appellant's specification merely says enables a larger amount of plasticizer to be incorporated (60% as against 40%), Sandler teaches varying pressure,

---

1. The specification points out a difference between *suspension* polymerizates and *emulsion* polymerizates and says "a dry-blending process for preparing plasticized mixtures of suspension polymerizates has been introduced * * * [which] however, has not been applicable to the treatment of emulsion polymerizates * * *." He says his invention is a method particularly for blending the latter.

inter alia, in order to obtain optimum results. We think this would suggest partial vacuum to one of ordinary skill in the art.

Appellant assigns error in the board's failure, on his request, to supply Rule 107 affidavits to support statements in its decision to the effect that heat would be generated by friction between particles in the reference processes and that those processes would produce a granular product or agglomerates. His theory is that the views of the board on these matters, with which he disagrees, are obviously based on facts within the personal knowledge of an employee of the Patent Office and contrary to the disclosure of the references. We see no error here. As to friction producing heat, the board was merely recognizing a fact known to anyone who has ever struck a match or slid down a rope. The mere failure of a reference to state the obvious is not cause for producing an affidavit. As for the production of agglomerates to a sufficient degree to produce a granular product from a powder, we have already explained why we find that implicit in Samler. Some things may be clear from disclosures though not expressed therein in so many words.

The decision of the board is affirmed.

Affirmed.