**In the Matter of the Application of Horst MEYER.**

**Appeal No. 79–505.**

United States Court of Customs and Patent Appeals.

June 7, 1979.

---

22.   *Cf. In re Weber,* 405 F.2d 1403, 56 CCPA 900, 160 USPQ 549 (1969); *In re Michalek,* 162 F.2d 229, 34 CCPA 1124, 74 USPQ 107 (1947).

Bruce M. Collins, New York City (Jacobs & Jacobs, P. C., New York City), attorneys of record, for appellant.

Joseph F. Nakamura, Washington D. C., for the Commissioner of Patents; Jack E. Armore, Washington D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NEWMAN,* Judges.

NEWMAN, Judge.

This is an appeal from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) sustaining the examiner's rejection of claims 2–6, and 9–12, of application serial No. 557,296, filed 11 March 1975, for "Process for the Preparation of 2-Nitrobenzaldehyde and Intermediates Therefor." We reverse.

## Background

### The Invention

The compound, 2-nitrobenzaldehyde, has been known for more than 80 years. It can be used, *inter alia*, as an intermediate in the production of the pharmaceutically active 4-nitrophenyl-1, 4-dihydropyridine derivatives. Appellant's invention resides in an industrially satisfactory process for the production of 2-nitrobenzaldehyde. Specifically, an alkali metal salt of a 2-nitrophenylpyruvic acid is reacted with an aqueous solution of an alkali metal hypochlorite to yield 2-nitrobenzylidene chloride, which compound is then subjected to aqueous hydrolysis at a temperature of from about 20°C to about 150°C to produce 2-nitrobenzaldehyde. Using sodium as the alkali metal, the process can be diagrammatically depicted as follows:

---

* The Honorable Bernard Newman, United States Customs Court, sitting by designation.

Advantageously, the 2-nitrophenylpyruvic acid can be prepared by treating 2-nitrotoluene with a diester of oxalic acid[1] and then using it directly without isolation. Claim 11 is illustrative of the appealed claims:

> 11. The process for the preparation of 2-nitrobenzaldehyde which comprises treating an alkali metal salt of the corresponding 2-nitrophenylpyruvic acid with an alkali metal hypochlorite in an aqueous medium to yield the corresponding 2-nitrobenzylidene chloride and subjecting said 2-nitrobenzylidene chloride to aqueous hydrolysis at a temperature of from about 20° to about 150°C.

Among the advantages of appellant's invention is that the starting materials, the 2-nitrotoluenes and oxalic acid diesters, are readily accessible in adequate quantity, and the end product is obtained from the hydrolysis in high yield and high purity.

*Prior Art*

Reissert,[2] the most pertinent reference of record, discloses, *inter alia*, the oxidation of 2-nitrophenylpyruvic acid using various oxidizing agents. The oxidation is generally described as follows:

> Upon the oxidation, which was studied very carefully and under a large number of different conditions in particular on the o-nitrophenyl pyruvic acid, the side chain is broken apart at one of the two places indicated by dashed lines in the following diagram

and either o-nitrophenyl acetic acid is produced or o-nitrobenzoic acid or o-nitrobenzaldehyde.[3] Upon oxidation by alkaline chlorine or bromine solution, halogen-containing products are furthermore formed.

Subsequent to this general description, Reissert describes specific oxidation experiments. These include, *inter alia*, oxidation experiment (d) which uses an alkaline bromine solution, specifically sodium hypobromite, and oxidation experiment (e) which uses calcium hypochlorite.[4] Use of sodium hypobromite resulted in the production of 2-nitrobenzylidene bromide, which compound was treated with sodium carbonate to remove the bromine, and then treated with phenylhydrazine acetate to yield 2-nitrobenzaldehyde phenyl hydrazone.[5] Use of calcium hypochlorite resulted in an unexamined chlorine-containing oil together with a crystalline substance of the formula $C_{16}H_{12}N_2O_6$.

Cassebaum[6] reviews various existing methods for the production of 2-nitrobenzaldehyde, none of which need be discussed here, and concludes that they are unsatisfactory. The author notes that even though the compound has been known for more than 80 years, the literature still fails to describe any advantageous method of producing it. Cassebaum then describes the method which he developed which comprises oxidizing 2-nitrophenylnitromethane

---

1. The nature of the diester of oxalic acid is not critical and generally it is of the formula (COOR)2 in which R is lower alkyl or aralkyl.

2. Reissert, *The Action of Ethyl Oxalate and Sodium Ethylate on Nitrotoluenes. Synthesis of Nitrated Phenylpyruvic Acids*, 30 BERICHTE DER DEUTSCHEN CHEMISCHEN GESELLSCHAFT 1030–1053 (1897).

   The transcript of record includes a translation of various excerpts from Reissert. Our discussion is based upon the translation.

3. The designation of the position of the nitro group as "O" or "ortho" is equivalent to the numerical designation "2." Hereinafter, only the numerical designation will be used.

4. It must be kept in mind that calcium is an alkaline earth metal in contradistinction to an alkali metal, such as sodium.

5. While Reissert does not expressly disclose hydrolysis of 2-nitrobenzylidene bromide to yield 2-nitrobenzaldehyde, we will assume this to be the case since appellant, in its brief before us, indicates that Reissert does disclose the hydrolysis step.

6. Cassebaum, *The Manufacture of O-Nitrobenzaldehyde*, 29 JOURNAL FUR PRAKTISCHE CHEMIE 59–64 (1965)

   Our discussion is based on the translation of various excerpts from Cassebaum included in the transcript of record.

with $KMnO_4$ to produce 2-nitrobenzaldehyde.

Clarens [7] discusses the conversion of hypochlorites and hypobromites to chlorates and bromates, respectively. No further discussion of this reference is deemed necessary since its relevance is tenuous, at best.

Feiser et al.,[8] the last of the references relied upon by the examiner, describes various reactions using sodium hypobromite and sodium hypochlorite, none of which involve the production of 2-nitrobenzaldehyde. As with Clarens, we see no need to further discuss this reference.

*Rebuttal Evidence*

A declaration was submitted by the inventor, Meyer, comparing the yield obtained by Reissert with that of the claimed process. By reacting 2-nitrophenylpyruvic acid with *sodium hypobromite*, Reissert's yield of 2-nitrobenzylidene bromide, based upon the acid employed, was *35.4%*. Assuming 100% conversion, the maximum yield of 2-nitrobenzaldehyde would only be 35.4%. Repeating Reissert's work, Meyer was unable to obtain a yield of more than about 18% of 2-nitrobenzylidene bromide.

In contradistinction to Reissert's use of sodium hypobromite, when *sodium hypochlorite* is used according to the claimed process, the yield of 2-nitrobenzylidene chloride, based upon the acid employed, is *64.3%*.

*Proceedings Below*

In the examiner's answer, all the appealed claims were rejected under *35 U.S.C. § 103* over Reissert taken in view of Cassebaum, Clarens, and Feiser et al. According to the examiner, Reissert discloses the use of an alkali metal hypobromite and equates the hypobromite and hypochlorite.[9] Accordingly, "the Reissert reference by itself

is deemed to teach every aspect of the claimed process and therefore the claimed process . . . [would have been,] at the very least[,] . . . obvious over Reissert." Cassebaum, Clarens, and Feiser et al. were relied upon as further evidence that it would have been obvious to use an alkali metal hypochlorite in place of the alkali metal hypobromite of Reissert.

With respect to appellant's uncontested evidence of unexpectedly improved yields with the alkali metal hypochlorite over the alkali metal hypobromite, the examiner dismissed it as "not persuasive of patentability."

The board affirmed the examiner. According to the board, it is "fairly well agreed that the difference in yields produced by the hypochlorite solution is significant and not readily explainable from the reference disclosures." With this in mind, the board phrased the issue to be decided as follows:

> [A]s observed by the examiner, the Reissert reference, by itself, teaches every aspect of the claimed process. Consequently, if Reissert constitutes an *anticipation*, 35 U.S.C. § 102(b), of the claimed subject matter, such rejection cannot be avoided by a showing under 37 C.F.R. 1.132. On the other hand, if the cited art merely renders the claimed process *prima facie* obvious, the showing of record would adequately rebut the inference of obviousness raised by the cited art. [Emphasis in original.]

The board concluded that Reissert anticipated the claimed invention, within the meaning of 35 U.S.C. § 102(b), since Reissert's reference to "alkaline chlorine or bromine solution" must be construed to mean *alkali* solutions of chlorine or bromine.

While the board apparently recognized that the examiner never mentioned 35 U.S.C. § 102, it, nonetheless, anomalously

7. Clarens, *On the Spontaneous Conversion of Hypochlorites to Chlorates and Hypobromites to Bromates*, 157 COMTES RENOUS DE L'ACADEMIE DES SCIENCES 216–19 (1913).

8. Feiser & Feiser, *Reagents for Organic Synthesis* 1083–87 (1967).

9. The examiner bases this conclusion on the paragraph quoted from Reissert, *supra*. As will be further discussed *infra*, in our view Reissert does not equate an alkali metal hypobromite with an alkali metal hypochlorite.

**1030**

concluded that a new ground of rejection was not being made since "anticipation is the epitome of obviousness."

In a request for reconsideration, appellant argued that the board denied it procedural due process inasmuch as the board, in effect, entered a new ground of rejection (under 35 U.S.C. § 102(b)) while not affording appellant the procedural options provided for in 37 CFR 1.196(b).[10] In addition, appellant submitted an affidavit by William Bertsche, the individual who prepared the translation of Reissert upon which the board relied. According to Bertsche, the German word actually used by Reissert, "alkalische," is an adjective and means alkaline or basic, referring to an alkaline condition capable of turning red litmus paper blue, and it cannot be translated to mean the noun, "alkali," as suggested by the board.[11]

In its decision on reconsideration, the board considered the newly submitted Bertsche affidavit even though it repeated its assertion that it had not made a new ground of rejection. While not expressly disavowing its prior construction of Reissert, the board did not repeat its prior statement that Reissert's reference to "alkalische" must be construed to mean "alkali." Instead, the board advanced a new theory for construing Reissert. Since Reissert's oxidation experiment (d) using sodium hy-

pobromite is entitled "d) With alkaline bromine solution," and since this language is identical to Reissert's prior reference to "alkaline chlorine or bromine solution," Reissert must have had in mind the specific alkaline bromine solution of oxidation experiment (d) when he equated "alkaline bromine or chlorine solution." Thus, in the light of this new theory, the board repeated its conclusion that Reissert anticipated the claimed subject matter.

OPINION

■ We will initially dispose of the examiner's rejection based on 35 U.S.C. § 103 since the board did not expressly reverse it. *See In re Pritchard*, 463 F.2d 1359, 59 CCPA 1284, 1292, 1365, 175 USPQ 17, 22 (1972). The Meyer declaration, which is undisputed, indicates that when Reissert's sodium hypobromite is used the yield of 2-nitrobenzylidene bromide was 35.4% (based on the acid employed). In contradistinction, when the claimed sodium hypochlorite is used the yield of 2-nitrobenzylidene chloride was 64.3%.[12] As the board correctly recognized, "if the cited art merely renders the claimed process *prima facie* obvious, the showing of record would adequately rebut the inference of obviousness raised by the cited art." In *In re Von Schickh*, 362 F.2d 821, 824, 53 CCPA 1352, 1355, 150 USPQ 300, 302 (1966), the court stated:

> Where request for such reconsideration is made the Board of Appeals shall, if necessary, render a new decision which shall include all grounds upon which a patent is refused. The applicant may waive reconsideration by the Board of Appeals and treat the decision, including the added grounds for rejection given by the Board of Appeals, as a final decision in the case.

10. § 1.196 *Decision by the Board of Appeals.*

\* \* \* \* \* \*

(b) Should the Board of Appeals have knowledge of any grounds not involved in the appeal for rejecting any appealed claim, it may include in its decision a statement to that effect with its reasons for so holding, which statement shall constitute a rejection of the claims. The appellant may submit an appropriate amendment of the claims so rejected or a showing of facts, or both, and have the matter reconsidered by the primary examiner. The statement shall be binding upon the primary examiner unless an amendment or showing of facts not previously of record be made which, in the opinion of the primary examiner, avoids the additional ground for rejection stated in the decision. The applicant may waive such reconsideration before the primary examiner and have the case reconsidered by the Board of Appeals upon the same record before them.

11. This is confirmed by Betteridge, *The New Cassell's German Dictionary* 12–13 (1958).

12. The examiner's answer did not contest that the use of an alkali metal hypochlorite produces an unexpectedly improved yield. The board stated that "it seems to be fairly well agreed that the difference in yields produced by the hypochlorite solution is significant and not readily explainable from the reference disclosures." The solicitor chose not to discuss appellant's evidence of nonobviousness.

Even assuming the process to be prima facie obvious from a consideration merely of the reactants, media, and steps employed, we think the invention as a whole must be deemed unobvious under 35 U.S.C. § 103 by reason of the increase in yield obtained while using considerably less nitrating acid. We find no suggestion of this characteristic of the claimed process. It appears to be quite unexpected and, being part of the invention as a whole, it should be treated under the law as is an unexpected property in compositions. [Citation omitted.]

Accordingly, the rejection of the claims under § 103 is reversed.

▇▇▇ Turning to the board's reliance on 35 U.S.C. § 102(b) in affirming the examiner,[13] we are convinced that this constituted a new ground of rejection. *In re Echerd,* 471 F.2d 632, 176 USPQ 321 (Cust.Pat.App. 1973). Considering that the examiner expressly stated the statutory ground of rejection was 35 U.S.C. § 103, that he never mentioned § 102, and that he never asserted Reissert anticipated the claimed subject matter, we conclude that the sole ground of rejection was, indeed, § 103. We decline to rely on conjecture as a basis for ascertaining what statutory ground of rejection the examiner might have had in mind.

▇▇▇ Recognizing the possibility that the examiner may not have made a § 102 rejection, the board made the following statement:

Although we realize that the examiner did not expressly frame his rejection as being based on 35 U.S.C. § 102, we consider such to be clear from his remarks. In any event, this is not a new ground of rejection, *since it has been repeatedly held that anticipation is the epitome of obviousness.* [Emphasis added.]

While it is true that prior cases[14] from this court have used such phrases as "anticipation is the epitome of obviousness" or "anticipation is the ultimate in obviousness," the board's reliance on those cases to support its conclusion that it had not made a new ground of rejection is totally misplaced. The use in prior cases of the aforementioned phrases is nothing more than the recognition of the commonsense fact that a rejection for obviousness under § 103 can be based on a reference which happens to anticipate the claimed subject matter. Those cases do not provide a license for the board to shift the statutory basis of rejection from § 103 to § 102 while denying appellant the procedural due process provided for by 37 CFR 1.196(b). *See In re Ercherd, supra ; In re Hughes,* 345 F.2d 184, 52 CCPA 1355, 145 USPQ 467 (1965). Since, as will be discussed hereinbelow, we disagree with the board on the merits of the § 102(b) rejection, there is no need to remand the case for further proceedings below.

▇▇▇ For Reissert to constitute an anticipation, it must identically disclose or describe, *inter alia,* reacting an alkali metal salt of 2-nitrophenylpyruvic acid with an *alkali metal hypochlorite. See In re Marshall,* 578 F.2d 301, 198 USPQ 344 (CCPA 1978). The Bertsche affidavit supports the conclusion that the reference in the Reissert translation to "oxidation by alkaline chlorine or bromine solution" should be construed to mean oxidation by a *basic* chlorine or bromine solution, and not oxidation by an *alkali* solution of chlorine or bromine. The genus, "alkaline chlorine or bromine solution," does not identically disclose or describe, within the meaning of § 102, the species alkali metal hypochlorite, since the genus would include an untold number of species.[15] *See In re Jacobson,* 407 F.2d 890,

---

**13.** It is clear the board based its affirmance on § 102(b) since the board expressly stated the evidence of record would have rebutted a rejection based on obviousness.

**14.** *See, e. g., In re Grose,* 592 F.2d 1161, 201 USPQ 57 (Cust.Pat.App.1979); *In re Skoner,* 517 F.2d 947, 186 USPQ 80 (Cust.Pat.App. 1975); *In re Pearson,* 494 F.2d 1399, 181 USPQ 641 (Cust.Pat.App.1974); *In re Dailey,* 479 F.2d

1398, 178 USPQ 293 (Cust.Pat.App.1973); *In re Kalm,* 378 F.2d 959, 54 CCPA 1466, 154 USPQ 10 (1967).

**15.** The expression "alkaline chlorine or bromine solution" would include *any* solution of chlorine or bromine which is basic, *i. e.,* which has a pH greater than 7.

896, 56 CCPA 982, 991, 160 USPQ 795, 800 (1969). In apparent recognition of that fact, the board relied upon the additional disclosure by Reissert of oxidation with sodium hypobromite. According to the board, Reissert's teaching that "[u]pon oxidation by alkaline chlorine or bromine solution, halogen-containing products are furthermore formed," must be construed to be a direct reference to Reissert's specific oxidation experiment (d), to wit, oxidation with alkaline bromine solution (sodium hypobromite being specifically disclosed). Construing Reissert in this manner, the board concluded that Reissert equated sodium hypobromite with sodium hypochlorite. The problem with the board's interpretation is that it ignores the remainder of the Reissert disclosure, including oxidation experiment (e), *i. e.*, oxidation with calcium hypochlorite, an "alkaline chlorine . . . solution." This reaction is described as producing, *inter alia*, a "chlorine-containing oil," which, needless to say, is a "halogen-containing" product. Thus, there is simply no reason to conclude that Reissert's generic reference to "alkaline chlorine or bromine solution" should be construed to refer only to specific oxidation experiment (d). Accordingly, since the aforementioned construction of Reissert by the board is without foundation, the board's rejection under § 102(b) must fall.

Summarizing, the examiner's rejection under § 103, and the board's new ground of rejection under § 102(b), are *reversed*.

*REVERSED*